## BURNS v GENERAL MOTORS CORPORATION

Docket No. 82792. Submitted February 5, 1986, at Lansing. Decided May 6, 1986.

Billy J. Burns, an employee of the Saginaw Steering Gear Division, General Motors Corporation, was determined by the Bureau of Workers' Disability Compensation to be totally disabled and entitled to workers' compensation disability benefits for both a myocardial infarction which was allegedly precipitated in 1978 by certain stressful conditions in Burns' employment and for a 1974 back injury. General Motors appealed that determination to the Workers' Compensation Appeal Board, which affirmed. General Motors appealed. *Held:*

1. The WCAB did not err in finding a reasonable relationship of cause and effect in the temporal proximity between the cardiac episode and Burns' ongoing mental stress.

2. The WCAB erred in awarding Burns interest on weekly compensation for periods for which he received alternate, extended disability benefits paid by General Motors' insurance carrier, Metropolitan Insurance Company. The WCAB's award of interest on the weekly compensation benefits is vacated.

3. The hearing referee awarded interest paid on $21,090.33 in medical expense reimbursement. That award of interest is vacated, since interest may not be awarded for medical expense reimbursement.

Affirmed in part and reversed in part.

1. WORKERS' COMPENSATION — FINDINGS OF FACT.

Findings of fact in workers' compensation proceedings are conclusive in the absence of fraud (Const 1963, art 6, § 28; MCL 418.861; MSA 17.237[861]).

REFERENCES

Am Jur 2d, Workmen's Compensation §§ 139, 224-230, 240-244, 289-295, 299-324, 333-337, 441 *et seq.*

Effect of injured employee's proceeding for workmen's compensation benefits on running of statute of limitations governing action for personal injury arising from same incident. 71 ALR3d 849.

Handling, preparing, presenting, or trying workmen's compensation claims or cases as practice of law. 2 ALR3d 724.

2. WORKERS' COMPENSATION — FINDINGS OF FACT — APPEAL.

> Appellate courts review findings of fact in workers' compensation proceedings only to determine whether there is any evidence to support them.

3. WORKERS' COMPENSATION — HEART DAMAGE — ATHEROSCLEROSIS — EVIDENCE.

> An employee with a history of atherosclerosis who is seeking workers' compensation benefits for heart damage allegedly caused by his employment must show specific incidents or events at work connecting the heart damage to the workplace because general conclusions of stress, anxiety, and exertion over a period of time are not sufficient to link the damage to the workplace; the employee must show a reasonable relationship of cause and effect between work and the heart damage, showing that employment is a cause of the damage.

4. WORKERS' COMPENSATION — INTEREST.

> The statutory interest imposed upon past due amounts under an award of workers' compensation benefits is imposed not as a penalty but rather is imposed because the employer benefits from the use of the money determined to be due to the employee and because the employee has to do without the use of the withheld funds.

5. WORKERS' COMPENSATION — INTEREST — ALTERNATIVE BENEFITS.

> An employer is not obligated to pay interest to an injured employee on workers' compensation benefits which accrued during periods of time when the employer's workers' compensation insurer paid alternative workers' compensation benefits to the employee pursuant to the workers' compensation award and the alternative benefits paid were credited against the award; in such case, the employee has no standing to assert entitlement to the interest since he has not been deprived of the use of those funds.

6. WORKERS' COMPENSATION — INTEREST — MEDICAL EXPENSE REIMBURSEMENTS.

> The granting of interest on awards of medical expense reimbursements by the Workers' Compensation Appeal Board has been precluded by the enactment of an amendment to the Worker's Disability Compensation Act which provides that interest at the rate of twelve percent is to be paid on awards of weekly compensation benefits from the date each payment is due until it is paid but makes no provision for interest on awards of other benefits (MCL 418.801[5]; MSA 17.237[801][5]).

*Davidson, Breen & Doud, P.C.* (by *Richard J. Doud*), for plaintiff.

*Braun, Kendrick, Finkbeiner, Schafer & Murphy* (by *Scott C. Strattard*), for defendant.

Before: ALLEN, P.J., and HOOD and R. C. LIVO,* JJ.

PER CURIAM. Defendant appeals by leave granted from a decision by the Workers' Compensation Appeal Board which affirmed a decision granting plaintiff workers' compensation disability benefits for both a myocardial infarction, which was allegedly precipitated in 1978 by certain stressful conditions in plaintiff's employment, and for a 1974 back injury. Plaintiff, who began his employment with defendant in 1947, testified that in 1974 he was working as a production foreman when he slipped off a ladder at work and fell to the floor. Near the end of 1974, he underwent a laminectomy.

Following his return to work, plaintiff was given the newly created position of scrap reduction foreman. It was his job to review the various departments in the plant and to assist in developing procedures to reduce scrap. In that capacity, plaintiff worked primarily with the supervisors of the various departments.

On April 10, 1977, an inventory was taken and it was discovered that there was a multi-million-dollar loss in the scrap reduction account. Plaintiff was not sure of the exact amount of the loss, but testified that $12,000,000 "stands out in my mind." Plaintiff was extremely upset. He felt like the inventory loss was being assigned to "just me" because the "7000 [scrap reduction] account was

---

* Circuit judge, sitting on the Court of Appeals by assignment.

mine." Plaintiff was told by either the plant manager or the plant superintendent that they wanted the 7000 account to operate in the black. In an effort to fulfill this objective, plaintiff worked "casual overtime," i.e., extra time for which he was not paid.

A month before the inventory was to be taken, plaintiff began feeling "queezy" [sic] and having an upset stomach twenty-four hours a day. The plant was in "a mess." Plaintiff explained that at inventory time all of the scrap material was physically removed from the plant and any remaining parts were considered to be good. Any questionable material, parts on which no determination had been made as to whether they were good or bad, was "red-tagged." The goal was to have all red-tagged material either removed from the plant or adjudged to be good prior to the day of inventory.

On an unspecified day prior to the inventory dates, the plant manager came up to plaintiff and said angrily, "I want to show you something." They walked to one department where there was a large pile of red-tagged material which foremen had placed in the middle of the floor. Plaintiff had been through the department previously and everything had seemed in order. The incident physically upset plaintiff, and on the way home that night, he stopped along the highway three or four times to throw up. In the weeks prior to the inventory and during the preparation stages, plaintiff would come into work feeling fatigued and go home fatigued.

On the day before inventory, the plant manager continued to press plaintiff to make sure the plant would be ready for inventory. Plaintiff skipped lunch that day to continue his plant inspection. During this time, plaintiff felt like there was "a belt tightening" around his chest and he had "a

sinking feeling" like everything was being drawn out of him. He began to have trouble breathing and perspiration began to run down his arms. Plaintiff went directly back to his office and sat down. He remained seated for the rest of the day and could not do anything.

When he got home he was "very, very sick." During the evening, he experienced another episode of shortness of breath and sweating. Plaintiff did not report to work over the weekend, i.e., the two days when inventory was to be taken. He stayed home and rested but still felt lethargic. Plaintiff went to work on Monday, May 1, 1978, but he felt like he "didn't have any drive, sort of washed out." He spent the day at his desk doing paperwork. People came in and "ribbed" him about not being there when inventory was taken.

On Tuesday, plaintiff went to see Dr. Balcueva, who took an EKG. Plaintiff then went home and lay down for the rest of the day. Around 2:00 A.M. the following morning, plaintiff again felt tightness in his chest, perspired, and had difficulty breathing. At that time, plaintiff decided to go to the hospital. Plaintiff was in Saginaw General Hospital for nine or ten days. Plaintiff then came home for an unspecified amount of time. Later, he was admitted to Cleveland Clinic, where a complete workup, a heart catheterization, and open heart surgery were performed.

Plaintiff attempted to return to work on three different days in January, 1979. However, on each occasion, he would have "sweats" and chest pains and would be unable to complete the day. Plaintiff testified, "I can't even go near the place—I just get all tight when I think of it" and "walking in the door was a problem in itself."

Andrew Strongrich, the plant manager, testified that plaintiff was a competent worker and was

given a lot of freedom in his job to decide how his time could best be spent. Plaintiff never complained that the job was giving him physical or mental difficulties. Strongrich acknowledged that there had been a huge inventory loss in the scrap reduction account in 1977.

Strongrich never told plaintiff that the 1977 loss was plaintiff's responsibility, and plaintiff was not held accountable for the loss because the loss was the responsibility of all forty foremen in the plant. However, he acknowledged that it was plaintiff's responsibility to investigate and try to solve the problem. He also admitted that plaintiff was the only scrap reduction coordinator in the plant and stated that scrap reduction was "of great concern to us."

The medical report of Dr. Helen Winkler was read into evidence. In the report, she concluded:

> This man's occupational stresses played an aggravating role in his underlying coronary atherosclerosis. His occupational stresses played a precipitating role in myocardial ischemia resulting in his symptomatology in April, 1978 for which he was hospitalized and subsequently had coronary artery by-pass surgery. His occupational activities aggravated his degenerative arthritis and disc degenerative disease.
>
> This man is totally and permanently disabled.

Dr. Winkler also testified:

> It was basically the initial onset of these symptoms in April of 1978 at which he [was] under pressure at that time and was walking through the plant and he noted the chest tightness, difficulty breathing accompanied by sweat and since that time, he has had periodic chest pain.
>
> He recalled this on a particular day at work. He

was under more than usual pressure than he would experience during the course of his normal work activities. So, I think that all of this is certainly compatible with him suffering from a myocardial ischemia at that time and this, of course, has become a recurrent situation and did require surgery.

The WCAB affirmed the referee's determination that plaintiff was totally disabled. We granted defendant's application for leave to appeal.

The defendant first argues that plaintiff failed to demonstrate a sufficient link between the heart damage and the workplace, as required by *Miklik v Michigan Special Machine Co,* 415 Mich 364; 329 NW2d 713 (1982). Defendant also urges that the factual findings of the WCAB are insufficient to support an award of benefits. At the time of plaintiff's injury in 1978, MCL 418.401(c); MSA 17.237(401)(c) provided:

Ordinary diseases of life to which the public is generally exposed outside of the employment shall not be compensable.[1]

In *Miklik,* the Supreme Court held:

There must be a relationship proved between the damage and *specific* incidents or events at work. General conclusions of stress, anxiety, and exertion over a period of time do not satisfy this second requirement. There must be enough detail about that which precipitated the heart damage to enable the factfinder to establish the legal connection by a preponderance of the evidence.

[1] MCL 418.401(c); MSA 17.237(401)(c) was amended in 1980, effective January 1, 1982. Since plaintiff's injury occurred prior to that time, the portion of that statute requiring a showing that the heart condition was "contributed to or aggravated or accelerated by the employment in a significant manner" is not applicable here. *Miklik, supra,* p 368, n 4.

The link between the work and the heart damage need only be one of reasonable relationship of cause and effect. Other possible or probable causes need not be excluded beyond doubt. Further, the work need not be the *sole* cause of the damage; it is sufficient if the employment is *a* cause. The factfinder must identify and evaluate the discrete factors of employment which are connected to the damage. The *Kostamo [v Marguette Iron Mining Co,* 405 Mich 105; 274 NW2d 411 (1978)] Court noted several examples which have been regarded as significant by courts and commentators: temporal proximity of the cardiac episodes to the work experience, hot and dusty conditions, repeated return to work after a cardiac episode, and mental stress. [415 Mich 370. Emphasis in original.]

Defendant argues that the WCAB improperly applied *Miklik* because it failed to find specific workplace events within close temporal proximity to the infarction, failed to find that such events directly contributed to the infarction, and failed to assess those specific events in objective terms as opposed to subjective terms. Defendant points to our recent decision in *Moreno v Campbell, Wyant & Cannon Foundry,* 142 Mich App 648; 369 NW2d 867 (1985), where we reversed the WCAB's award of benefits and noted that the mere occurrence of symptomology while working, absent specific precipitating events at work, was insufficient to support a finding of compensability. The *Moreno* decision was bottomed on a lack of evidence establishing the necessary legal connection between the injury and the employment.

We disagree that in the instant case there was a lack of evidence establishing the connection between the damage to plaintiff's heart and his workplace. Findings of fact in workers' compensation proceedings are conclusive in the absence of fraud. Const 1963, art 6, § 28; MCL 418.861; MSA

17.237(861). Appellate courts review such findings only to determine whether there is any evidence to support them. *Aquilina v General Motors Corp,* 403 Mich 206, 213; 267 NW2d 923 (1978).

While the defendant argues that the only specific event found by the WCAB was the inventory mistake that occurred one year prior to the myocardial infarction, and while it further urges that the WCAB engrafted a subjective element onto its finding by crediting the fact that plaintiff "felt" responsible for the mistake, we find that the WCAB's compensability determination was well supported by plaintiff's testimony of the ongoing mental stress associated with his job as scrap reduction foreman. Moreover, unlike in *Moreno,* the WCAB in this case specifically referred to the medical testimony of Dr. Winkler, who considered the pressures of the events on the date prior to the 1978 inventory as playing an aggravating role in his underlying coronary atherosclerosis. Further, the attack occurred at work during a time in which plaintiff was hurrying to complete preparations for the impending inventory.

The pressure at plaintiff's workplace was heightened by defendant's desire to make a good showing and not repeat the disastrous results of the prior year. Moreover, there was testimony of other specific incidents (e.g., when Strongrich discovered and showed plaintiff a large pile of red-tagged material in one department) and the resulting effect upon plaintiff. Given this evidence in the record, the WCAB did not err in finding a reasonable relationship of cause and effect in the temporal proximity between the cardiac episode and the plaintiff's ongoing mental stress. Cf., *Kirby v General Motors Corp,* 145 Mich App 798; 377 NW2d 915 (1985).

Defendant also argues that the WCAB erred by

awarding plaintiff interest on weekly compensation for periods for which plaintiff received alternate benefits. The WCAB did not address the issue in its decision, but simply ordered: "Interest on weekly compensation benefits shall be paid plaintiff at the rate of twelve percent per annum from the date each payment was due until paid." The hearing referee ordered that "defendant shall be credited with all S & A benefits made to the plaintiff from 5-3-78 on." However, plaintiff received both sickness and accident (S & A) benefits paid directly by defendant and extended disability benefits (EDB) paid by defendant's carrier, Metropolitan Insurance Company. While defendant concedes that, to the extent the compensation award was higher than the alternative benefits received, interest would be due on the differential amount, defendant argues that *McCaslin v General Motors Corp,* 133 Mich App 782; 349 NW2d 544 (1984), lv den 419 Mich 945 (1984), is controlling and dispositive as to both types of alternative benefits received by plaintiff in this case.

In *McCaslin,* this Court noted that interest is imposed upon past due workers' compensation benefits not as a penalty, but because the employee had to do without the use of funds to which he was entitled, and the employer benefited from the use of the money while the employee's claim was pending. *Id.,* pp 787-788. The Court held that the employer was not obligated to pay interest on weekly benefits pursuant to a workers' compensation award where alternative benefits were advanced to the employee by the employer and such benefits were credited against the award. Defendant claims that the holding in *McCaslin* is equally applicable to the instant case.

However, more recently in *Montanez v Chrysler Corp,* 145 Mich App 551; 378 NW2d 546 (1985),

this Court distinguished between alternative funds advanced directly by the employer and funds provided by a separate group insurer assignee and held that even though the plaintiff in that case was not denied the use of funds, because he was paid S & A benefits, the defendant nonetheless enjoyed the use of unpaid compensation benefits and the plaintiff's own insurer, Aetna, was deprived of the use of the funds it advanced to the plaintiff in lieu of the compensation benefits. The Court found that where an employee receives benefits from a source totally unconnected with an employer, such as his own independent insurance policy, the decision of *McCaslin* would provide little incentive for the employer to promptly pay compensation claims and would allow the employer to reap benefits by delaying and keeping the funds for its own use. The Court concluded that requiring interest to be paid by the employer on a workers' compensation claim assigned to a group S & A insurer would directly encourage the employer to promptly pay compensation claims as well as reimburse the insurer for the use of its funds.

In the instant case, defendant argues that *Montanez* was wrongly decided, and that to the extent General Motors benefited by virtue of the fact that Metropolitan, rather than General Motors, paid EDB, such benefit is reflected in the premiums General Motors pays to Metropolitan. Defendant also argues, as Chrysler attempted to do in *Montanez,* that plaintiff is without standing to assert any entitlement for interest due Metropolitan. In *Montanez,* this Court declined to consider Chrysler's standing argument and ruled that because Chrysler did not raise the interest issue in the proceedings below, the Court could not allow it to raise the issue on appeal to the possible detriment of

Aetna, which had not had the opportunity to respond to Chrysler's argument either before the WCAB or in this Court. However, in the case at bar, since defendant raised this issue in a supplemental brief filed before the WCAB prior to its decision, we find that Metropolitan had ample opportunity to raise its claim for interest against defendant for the EDB payments.

We agree that only Metropolitan and not the plaintiff would have standing to assert any entitlement to interest. *Remo v Ford Motor Co,* 1978 WCABO, No 221. Since Metropolitan is defendant's EDB carrier, we think that any claim that interest is due on EDB payments from Metropolitan to the plaintiff is a matter which in this case is strictly between the insurer and the defendant. We note too that the reimbursement agreement executed between plaintiff and Metropolitan contains no specific provision for the recovery of such interest and plaintiff clearly does not represent the assignee. Since Metropolitan has raised no claim for interest and since plaintiff has failed to show that he did indeed suffer the loss of use of these funds, we hold that this case is controlled by *McCaslin* and not by *Montanez.* Accordingly, the WCAB's award of interest on weekly compensation benefits is vacated.

Finally, the hearing referee awarded interest paid on $21,090.33 in medical expense reimbursement. Although defendant challenged this interest award in its supplemental brief to the WCAB, the board's decision left unclear the disposition of this issue. In *Brown v Eller Outdoor Advertising Co,* 139 Mich App 7, 10-16; 360 NW2d 322 (1984), this Court copiously examined this question and concluded that interest may not be awarded for medical expense reimbursement. That decision is dispositive of the issue.

In view of our conclusion that the proofs were of sufficient specificity to demonstrate a link between plaintiff's heart damage and the workplace, we find it unnecessary to address the propriety of the wcab's finding that plaintiff was also disabled by a continuing back-related injury. We agree that plaintiff is totally disabled by the work-related myocardial infarction. The awards of interest for the periods of receipt of alternative benefits and medical expense reimbursement are vacated.

Affirmed in part and reversed in part.